UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD F. MARTINEZ,<br><br>    Plaintiff,<br><br>  v.<br><br>A. PARKS,<br><br>    Defendant. | Case No.: 1:21-cv-001496-KES-CDB<br><br>**SECOND SCREENING ORDER** |

Plaintiff Ronald F. Martinez is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. section 1983.

**I.    INTRODUCTION**

The Court issued its first screening order on August 2, 2023. (Doc. 44.) It found Plaintiff's operative complaint stated cognizable First Amendment retaliation claims against Defendants Parks and M. Lirones based upon his litigation efforts but failed to state cognizable retaliation claims based upon Plaintiff's legal assistance to other inmates. (*Id*. at 12-13.) Plaintiff was given leave to file a fourth amended complaint, or to file written notice that he did not want to amend and wished to stand on his complaint as screened, or to file a notice of voluntary dismissal. (*Id*. at 13-14.)

On August 24, 2024, Plaintiff filed a fourth amended complaint. (Doc. 47.)

## II. SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). The Court should dismiss a complaint if it lacks a cognizable legal theory or fails to allege sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## III. PLEADING REQUIREMENTS

### A. Federal Rule of Civil Procedure 8(a)

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). A complaint must contain "a short and plain statement of the claims showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512 (internal quotation marks & citation omitted).

Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Factual allegations are accepted as true, but legal conclusions are not. *Id.* (citing *Twombly*, 550 U.S. at 555).

The Court construes pleadings of pro se prisoners liberally and affords them the benefit of any doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citation omitted). However, "the liberal pleading standard . . . applies only to a plaintiff's factual allegations," not his legal theories. *Neitzke v. Williams*, 490 U.S. 319, 330 n.9 (1989). Furthermore, "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled," *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (internal

2

1    quotation marks & citation omitted), and courts "are not required to indulge unwarranted
2    inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) (internal quotation
3    marks & citation omitted). The "sheer possibility that a defendant has acted unlawfully" is not
4    sufficient to state a cognizable claim, and "facts that are merely consistent with a defendant's
5    liability" fall short. *Iqbal*, 556 U.S. at 678 (internal quotation marks & citation omitted).

### B. Linkage and Causation

Section 1983 provides a cause of action for the violation of constitutional or other federal rights by persons acting under color of state law. *See* 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must show a causal connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. *See Rizzo v. Goode*, 423 U.S. 362, 373-75 (1976). The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legal required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (citation omitted).

### C. Supervisory Liability

Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. *Iqbal*, 556 U.S. at 676-77; *see e.g., Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1020-21 (9th Cir. 2010) (plaintiff required to adduce evidence the named supervisory defendants "themselves acted or failed to act unconstitutionally, not merely that subordinate did"), *overruled on other grounds by Castro v. C'nty of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016); *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983").

Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "The requisite causal connection may be established when an official sets in motion a

'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009). Accord *Starr v. Baca*, 652 F.3d 1202, 1205-06 (9th Cir. 2011) (supervisory liability may be based on inaction in the training and supervision of subordinates).

Supervisory liability may also exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations & quotations marks omitted), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1970).

To prove liability for an action or policy, the plaintiff "must ... demonstrate that his deprivation resulted from an official policy or custom established by a ... policymaker possessed with final authority to establish that policy." *Waggy v. Spokane County Washington*, 594 F.3d 707, 713 (9th Cir.2010). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). Vague and conclusory allegations concerning the involvement of supervisory personnel in civil rights violations are not sufficient. *See Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).

**IV.    DISCUSSION**

**A. Plaintiff's Fourth Amended Complaint**

Plaintiff names Library Trained Assistant (LTA) S. Parks and LTA Supervisor M. Lirones, both employed at California State Prison, Corcoran (CSP-Cor), as Defendants. (Doc. 44 at 1, 5-6.) He seeks damages of $100,000, costs of suit and reasonable attorney fees,[1] the appointment of counsel,[2] and any other relief the Court deems just and proper. (*Id.* at 24-25.)

---

[1] Plaintiff, who is proceeding pro se, is not entitled to attorney's fees. *Kay v. Ehrler*, 499 U.S. 432, 435 (1991).

[2] Plaintiffs do not have a constitutional right to appointed counsel in section 1983 actions. *Rand v. Rowland*, 113 F.3d 1520, 1525 (9th Cir. 1997), rev'd in part on other grounds, 154 F.3d 952, 954 n.1 (9th Cir. 1998). Nor can the Court require an attorney to represent a party under 28 U.S.C. section 1915(e)(1). *See Mallard v. U.S. Dist. Court*, 490 U.S. 296, 304-05 (1989). Plaintiff is advised he may submit a separate motion seeking the appointment of counsel. If he elects to do so, he should set forth the reasons he believes he meets the extraordinary circumstances exception. *Rand*, 113 F.3d at 1525.

4

### B. Plaintiff's Factual Allegations

In or about July 2018, Plaintiff was transferred from Salinas Valley State Prison to CSP-Cor. (Doc. 44 at 7.) Inmate Jackson, who resided in the same unit as Plaintiff and learned of Plaintiff's litigation experience, advised LTA Parks about Plaintiff. (*Id*.) As a result, LTA Parks asked that Plaintiff be assigned as a new law library clerk. (*Id*.) Between August 2018 through October 2019, Plaintiff noticed Parks "would get angry, visibly upset, and yell at Mr. Jackson for assisting other inmates with [their] legal work and/or answering questions, all [loud] and in front of everyone [attending] that law library session. (*Id*.)

Plaintiff alleges he and inmate Jackson often discussed Parks' "disrespectful, illegal conduct," and Plaintiff expressed his surprise that Parks had not been the victim of an assault or violent attack. (Doc. 44 at 8.) Plaintiff advised Jackson he hoped Parks "would not act in this manner with him." (*Id*.) During Jackson's tenure, Parks did not yell at Plaintiff when Plaintiff spoke with and assisted other inmates with their legal work or paperwork or navigating the Law Library Electronic Delivery System (LLEDS). (*Id*.) Parks would get angry and yell at Jackson only. (*Id*.)

In mid-2019, Plaintiff was placed on C-status and was removed from the law library clerk position. (Doc. 44 at 8.) However, Plaintiff continued to access the law library as a general legal user (GLU), an inmate without a court filing deadline, or as a priority legal user (PLU), denoting an inmate with a court deadline. (*Id*.) While in the law library, Plaintiff assisted other inmates with their legal work and answered legal questions. (*Id*.) During that same period, Plaintiff informed Parks "about recent settlements reached with CDCR, the amount received, and anticipated and new lawsuit filings." (*Id*.)

In September 2020, while Plaintiff was attending a law library session, Parks advised Plaintiff a clerk position had recently been filled by another inmate in his unit, and asked Plaintiff whether he knew the inmate and whether the inmate knew anything about the law. (Doc. 44 at 8.) Plaintiff next states: "Long story short: He did not know anything about the law and this inmate and I would exchange work assignments (he to my porter job, me to his clerk position) which defendant Parks approved." (*Id*.) On October 6, 2020, Plaintiff was reassigned as a clerk for the

5

Facility C law library. (*Id.*)

Plaintiff contends Parks asked Plaintiff to train inmate E. Laundry. (Doc. 44 at 8.) Laundry was a recent hire "learning the 'law' on the job training style." (*Id.*) Plaintiff trained Laundry on clerking duties and answered Laundry's requests for assistance. (*Id.* at 8-9.)

On April 5, 2021, while Plaintiff waited for the gate to open in the recreation yard so he could go to work, an inmate asked Plaintiff to assist him in getting into the law library "and explained his situation." (Doc. 44 at 9.) Once at work, Plaintiff informed Parks about the inmate in the yard needing library access to copy and file a petition for writ of habeas corpus. (*Id.*) Plaintiff advised Parks he had the inmate's name and asked whether Parks could "get him in any time soon." (*Id.*) Plaintiff contends Parks yelled, "How do you know this?" (*Id.*) Plaintiff stated to Parks that he was asked by the other inmate. (*Id.*) Parks responded by asking Plaintiff, "What are you doing talking to another inmate?" (*Id.*) Plaintiff replied, "What? Now I am not supposed to talk to [inmates]?" (*Id.*) Parks advised Plaintiff that the inmate needs to submit a request for access form and Plaintiff responded by advising Parks the inmate told Plaintiff "he submitted 4–5 of them already but never received a response." (*Id.*) This angered Parks, who was "way behind responding" to such requests because she spends hours each day gossiping with other staff. (*Id.*) Parks "got real red in the face and started yelling and pounding/slapping her desk all in front of numerous inmates." (*Id.*) Specifically, Parks yelled something like "You [can't] just help anybody with [their] legal work! They need to do it themselves." (*Id.*) Plaintiff was embarrassed, belittled and disrespected, "as if he was doing something wrong or illegal activity." (*Id.*) Plaintiff replied, "What do you expect me to do? Just ignore them when they ask me a question about the law library or access… [it is] my Job and I want to do it and going to do it." (*Id.*) Next, Plaintiff states had he "been the same dummy he was 20-years ago he would have [assaulted], attacked, battered, defendant Parks for the disrespect and yelling at him like he was some kind of punk bitch or something." (*Id.*)

On April 8, 2021, Plaintiff spoke with Parks, telling Parks "her yelling was not justified," that he was only doing his job, and that even without the position he wants to help other inmates. (Doc. 47 at 10.) Plaintiff politely asked Parks not to yell at him and that if she felt Plaintiff had

6

1  done something wrong to speak with him about it. (*Id*.) Plaintiff states Parks reluctantly agreed.
2  (*Id*.)
3        On April 12, 2021, during the morning session in the law library, Plaintiff was assisting an
4  inmate with an emergency state habeas corpus petition. (Doc. 47 at 10.) The inmate planned to
5  use a fill-in-the-blanks petition, but Plaintiff encouraged him to make it "more presentable"
6  because he would only get one opportunity to present his argument for compassionate release.
7  (*Id*.) Shortly after, Parks asked the inmate whether he was going to "copy his version of the
8  petition or not." (*Id*.) If he was not planning to do so, Parks stated the inmate had to leave. (*Id*.)
9  Plaintiff advised Parks that he had been assisting the inmate, but Parks yelled at Plaintiff that he
10 could not help an inmate do their legal work. (*Id*.) Plaintiff stated, "I am only doing my job, what
11 are you talking about?" (*Id*.) Plaintiff contends Parks kicked the inmate out of the law library.
12 (*Id*.) Plaintiff told the inmate he would assist him later after work. (*Id*.)
13       Plaintiff asserts that the Facility C law library is not complying with *Bounds v. Smith*, 430
14 U.S. 817 (1977), requiring prison law libraries to provide sufficient assistance from persons
15 trained the law. (Doc. 47 at 10.) Without Plaintiff as a clerk, there is no one to assist other
16 inmates. (*Id*.) Plaintiff states Defendant Parks does not know how "to prepare a traverse, oppose
17 defendants MSJ, prepare discovery, and/or other legal documents to further legal claims for
18 relief." (*Id*. at 11.) Plaintiff alleges Parks' "ignorance, stupidity, and retaliatory acts of yelling at
19 Plaintiff" when he assists others "is tantamount to [getting] angry and irate at a fireman for
20 assisting to [put] out a house fire, or a police officer enforcing the law." (*Id*.)
21       During the afternoon session on April 12, 2021, Plaintiff was helping an inmate who had
22 difficulty reading and understanding legal forms. (Doc. 47 at 11.) Plaintiff read the instructions
23 and filled out the forms for the inmate based upon information provided by the inmate. (*Id*.)
24 Plaintiff did not sign the inmate's name or enter the date on any form. (*Id*.) When the inmate
25 provided the forms to Parks for copying, Parks recognized Plaintiff's handwriting. (*Id*.) She got
26 angry and yelled, "You can not be helping the inmate with [their] legal work," telling Plaintiff he
27 was helping them too much. (*Id*.) Plaintiff told Parks she was "'really tripping,'" that she yelled at
28 him for doing his job, and that he did not "need this shit." (*Id*.) He was afraid he would lose

control of his anger and assault Parks for her blatant disrespect of him. (*Id*.) Plaintiff told Parks that she "might as well fire him now" because he was going to continue to help other inmates with legal work and answer questions when asked. (*Id*.) Parks ordered Plaintiff to leave and thereafter did not call Plaintiff in for work. (*Id*.) Plaintiff asserts fellow clerk Laundry witnessed his exchange with Parks. (*Id*. at 12.)

Plaintiff alleges Parks retaliated against him by yelling at him for assisting other inmates with their legal work, by firing him as a law library clerk, and by drafting a false Rules Violation Report (RVR) to conceal her own illegal conduct because Plaintiff was engaging in free speech while assisting other inmates. (Doc. 47 at 12.) Plaintiff filed numerous grievances regarding access to the law library and lawsuits, including *Martinez v. Baughman, et al*., in this Court's case number 1:19-cv-01459-DAD-JLT, "all conducted in and out of work as a law library clerk," for engaging in protected conduct. (*Id*.) Plaintiff argues Parks violated his right to free speech and association by yelling at him for talking to other inmates and assisting them with questions and legal work. (*Id*.) Further, Plaintiff alleges "under the doctrine of 'Unconstitutional Conditions,'" Parks fired him "because of previous filed grievances against defendant Lirones," assisting other inmates with filing grievances and lawsuits against CDCR, and due to Plaintiff's previous lawsuits and settlements involving CDCR. (*Id*.) Plaintiff alleges Parks placed "excessive burdens" on his free speech rights "by yelling, getting mad, angry, at Plaintiff for talking with other prisoners about filing/drafting certain motion(s) Plaintiff did not yet know about the format and/or grievances regarding the race-based modified program Plaintiff and all STG-SURENOS were subject to by interfering with his library clerk job by the alleged retaliatory firing above." (*Id*.)

Plaintiff contends that in an attempt to conceal the "retaliatory firing," Parks fabricated a work supervisor's report on April 12, 2021, alleging Plaintiff was angry because he could not conduct his own legal work, that Plaintiff refused to assist or train inmate Laundry, and that Plaintiff was not receptive to counseling. (Doc. 47 at 13.) On April 29, 2021, Parks fabricated a work supervisor's report by indicating Plaintiff refused to sign the report, but Plaintiff was never provided the opportunity. (*Id*.)

On or about May 21, 2021, Plaintiff was allegedly involved in an attempted murder on an

8

inmate with an inmate-manufactured weapon. Because of a head injury, Plaintiff was transported to an off-site hospital treatment. (Doc. 47 at 13.) On May 24, 2021, Plaintiff was "assigned the infirmary AD-SEG status." (*Id*.) Without physical access to the law library, CDCR policy allows inmates to utilize a paging system to request case law, statutes and other materials contained in LLEDS. (*Id*.) According to Plaintiff, librarians are mandated to provide the paging material within 16 days of the request. (*Id*.) Between June 9 and June 19, 2021, Plaintiff sent Parks two paging requests and a request to file an application for *in forma pauperis* (IFP) status. (*Id*. at 14.)

On June 20, 2021, Library Supervisor M. Lirones went to the infirmary to bring Plaintiff his IFP application and trust account statement. (Doc. 47 at 14.) When Plaintiff asked about the paging requests, Lirones advised Plaintiff "they were 'working on it.'" (*Id*.) Plaintiff indicated to Lirones that he was going to file suit against Parks for firing him without just cause. (*Id*.) Lirones told Plaintiff to submit a request for interview form, a GA-22, and she would come back to pick it up. (*Id*.)

On or around June 30, 2021, Plaintiff learned that infirmary patients had access to LLEDS. (Doc. 47 at 14.) He also learned he needed a ducat for access. (*Id*.) Plaintiff submitted a GA-22 to Lirones requesting "her to [schedule Plaintiff] time and ducat for the LLEDS in" that unit. (*Id*.) Lirones advised Plaintiff he did not need a ducat and only needed to ask infirmary staff for access. (*Id*.) But when Plaintiff asked infirmary staff, a sergeant stated a ducat was required. (*Id*.) Plaintiff states Lirones "refused and failed to let Plaintiff know" he had LLEDS access when she met with him. (*Id*.) Plaintiff alleges that was an act of retaliation for his having submitted previous paging requests that were denied, noting LLEDS access was available to Plaintiff and that Lirones refused to issue a ducat. (*Id*. at 15.) Plaintiff contends he never gained access to LLEDS nor received any paging materials while in the infirmary between May 24 and July 21, 2021. (*Id*.)

On July 21, 2021, Plaintiff was transferred from the infirmary to Facility 4A Ad-Seg. (Doc. 47 at 15.) From July 23, 2021, through August 24, 2022, Plaintiff submitted numerous requests to access the law library as a GLU and submitted paging requests to make copies and conduct research. (*Id*.) Lirones and Parks provided only a single late response to his August 24,

2021, request, ignoring his requests from July 30 and August 17, 2021, conduct Plaintiff alleges is retaliatory. (*Id*.) Between August and October 2021, Plaintiff submitted numerous requests, including a request to copy the complaint in this action and a state habeas petition in a Kings County Superior Court case regarding Ad-Seg living conditions. (*Id*.) Plaintiff contends CSP-Cor allows GLU inmates "one-time access to the law library just to make legal copies and mail out from there." (*Id*.)

On August 15, 2021, Parks issued Plaintiff an August 2021 memorandum indicating no inmates would be allowed access to the law library without a verified court filing deadline, and that GLU inmates had no access. (Doc. 47 at 16.) Inmates needing copy services were to send their documents to the law library via institutional mail "with all trust withdrawal, forms, copy forms, envelope request forms, all filled-out, with the address(es) for mailing." (*Id*.) Parks was then to return all original documents. (*Id*.) The prohibition of GLU access was due to purported staff shortages and COVID-19 safety protocols. (*Id*.) Plaintiff alleges this was instead an act of retaliation because Parks could have easily permitted him access when only one or two PLU inmates accessed the law library "contrary to" the safety protocols and purported staff shortages. (*Id*.) Plaintiff asserts that when he was finally approved for PLU status in January 2022, he was the only inmate present and "10-12 empty cages/cells for GLU could have used/occupied (5-6 percent COVID protocols)." (*Id*.) Between January 2022 and September 2022, as a PLU user, Plaintiff noted about "2-3 sessions wherein there was more than 4 PLU inmates accessing the law library at one time." All other sessions involved only "2-3 PLU's." (*Id*.)

Plaintiff states there was "NO WAY" he was going to send his legal documents, including two lawsuits against prison staff, to Parks. (Doc. 47 at 16.) One of those suits named Parks. (*Id*.) Plaintiff asserts grievances that "get 'lost', 'misplaced', or the dog ate it through the prison mail system." (*Id*.) Because Lirones and Parks prohibited Plaintiff's access to make copies of his own complaints, "Plaintiff was forced to request" that this Court assist him in this case and another. (*Id*.)

On October 14, 2021, Plaintiff submitted a PLU request and declaration form seeking access for 30 days "to fill-out, copy his IFP and Trust Account Statement" for this case. (Doc. 47

at 16.) Thirteen days later, Lirones allowed Plaintiff one-time access just to permit copying and mailing out of the IFP motion and supporting documents. (*Id.* at 17.) Lirones' refusal to allow 30-days of access was an act of retaliation "because of the IFP motion was against her friend and co-worker defendant LTA Parks in this action." (*Id.*) Further, Plaintiff alleges neither Lirones nor Parks honored that one-time access, another act of retaliation. (*Id.*)

In August through September 2, 2021, Plaintiff submitted four or five GA-22 forms to Defendants requesting that they go to Plaintiff's cell to retrieve his paperwork, make copies, and return the documents to him. (Doc. 47 at 17.) Plaintiff explained in the forms that "he had grave concerns of his legal work disappearing in the institutional mail system." (*Id.*) Defendants "refused and failed to respond" to the requests. Plaintiff alleges this too was retaliation. (*Id.*) When Plaintiff realized Lirones was also retaliating against him, he "redrafted the complaint to include Lirones as a defendant." (*Id.*)

On November 3, 2021, Plaintiff submitted a request for PLU access to the law library for 30 days to work on discovery "in the GAMBOA action." (Doc. 47 at 18.) Lirones denied the request on November 5, 2021, citing Rule 30(a)(3) and indicating the rule did not establish a deadline. (*Id.*) She claimed Plaintiff was exempt from "initial disclosures under FRCP 26(a)(1)(B)(iv)" and only recognized the defendants' December 31, 2021, deadline to file a dispositive motion. (*Id.*) Plaintiff contends Lirones is savvy and used the Federal Rules of Civil Procedure and Local Rules to prevent him from receiving the requested PLU access. (*Id.*)

On November 14, 2021, Plaintiff submitted a request for PLU access to the law library for 30 days to work on an IFP motion in the Rodriguez action involving a 45-day deadline. (Doc. 47 at 18.) On November 29, 2021, Lirones responded and indicated two trust account statements had been returned to the Trust Account Office because Plaintiff failed to mail them within 30 days. (*Id.* at 18-19.) Plaintiff was instructed to ask the court for new IFP forms. (*Id.*) Plaintiff contends that had Lirones and Parks honored the one-time access he sought back on October 27, 2021, and not retaliated against him, he would have filed the IFP motions and habeas petitions. (*Id.* at 19.)

In January and February 2022, Plaintiff was granted PLU status for filing in another case and to file an amended complaint in this case. (Doc. 47 at 19.) On February 10, 2022, during a

1  PLU session, Parks "made an issue about not wanting to copy the amended complaint because of
2  it containing 3 'cut-n-pasted' pages that needed to be copied on the copy machines glass, one at a
3  time." (*Id*.) Plaintiff told Parks he had done similar copying while he was her clerk. (*Id*.) Plaintiff
4  asked Parks to copy his 109-page handwritten complaint; she apparently indicated it was not a
5  problem. (*Id*.) However, when Parks learned the complaint involved allegations concerning she
6  and Lirones, Parks advised Plaintiff she could not copy the document because it was too lengthy.
7  (*Id*.) Plaintiff states he "called-out" Parks for "her obvious instant change of mind" and
8  referenced his prior GA-22 requests seeking access to make copies. (*Id*.) Parks stated she never
9  read the requests. (*Id*.) Plaintiff asserts Parks denied them. (*Id*.)

10  Next, Plaintiff alleges Parks would not show up on Plaintiff's designated law library days
11  and refused to make up the missed sessions on various occasions. (Doc. 47 at 20.)  In March
12  2022, Parks failed to forward a court order and PLU request to Lirones. (*Id*.) Also in March 2022,
13  Plaintiff submitted several PLU request forms, but Lirones denied each of the requests or directed
14  that he resubmit them only to deny the request later. (*Id*. at 20-23.) Plaintiff asserts these were
15  acts of retaliation by Defendants. (*Id*.)

16  Plaintiff alleges Defendants retaliated against him because he engaged in protected
17  conduct: filing the lawsuit against Defendant Parks, submitting numerous access requests and
18  grievances regarding access to the law library, and "trying to comply and file the original
19  Complaint in October 2021, and the RODRIGUES lawsuits." (Doc. 47 at 23.) He further alleges
20  their adverse actions chilled the exercise of his First Amendment rights and did not advance any
21  legitimate penological interests or goals. (*Id*.)

22              **C.  Plaintiff's Claims**

23  The Court construes Plaintiff's fourth amended complaint to assert First Amendment
24  retaliation claims against Defendants Lirones and Parks based upon their conduct related to his
25  grievances and lawsuits, and against Defendant Parks for her conduct related to his law library
26  clerk position.

27
28

*Applicable Legal Standards*

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a section 1983 claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *accord Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

Adverse action taken against a prisoner "need not be an independent constitutional violation. The mere threat of harm can be an adverse action." *Watison*, 668 F.3d at 1114 (internal citations omitted). A causal connection between the adverse action and the protected conduct can be alleged by an allegation of a chronology of events from which retaliation can be inferred. *Id.* The filing of grievances and the pursuit of civil rights litigation against prison officials are both protected activities. *Rhodes*, 408 F.3d at 567-68. The plaintiff must allege either a chilling effect on future First Amendment activities, or that he suffered some other harm that is "more than minimal." *Watison*, 668 F.3d at 1114. A plaintiff successfully pleads that the action did not reasonably advance a legitimate correctional goal by alleging, in addition to a retaliatory motive, that the defendant's actions were "arbitrary and capricious" or that they were "unnecessary to the maintenance of order in the institution." *Id.*

*Analysis*

Liberally construing the fourth amended complaint, and as found in this Court's first screening order (*see* Doc. 44 at 10-12), Plaintiff plausibly alleges cognizable First Amendment retaliation claims against Defendants Lirones and Parks based upon their conduct related to his grievances and lawsuits.

Next, liberally construing the fourth amended complaint and affording Plaintiff every doubt, Plaintiff plausibly alleges a First Amendment retaliation claim against Parks for Parks' comments, behavior, and actions concerning Plaintiff's position as a law library clerk. Plaintiff plausibly alleges that Parks took adverse action against him in the form of a retaliatory firing because he assisted other inmates with their legal work while performing his job as a law library clerk, chilling Plaintiff's exercise of his First Amendment freedom of speech and association rights in the absence of a legitimate correctional goal. *Rhodes*, 408 F.3d at 567-68; *Vignolo v. Miller*, 120 F.3d 1075, 1077-78 (9th Cir. 1997) (reversing dismissal of First Amendment retaliation claim "on the bare ground that there is no constitutional right to prison employment" because "even though a person has no 'right' to a valuable governmental benefit and even though the government may not deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom speech"); *see Yescas v. McCourt*, No. 3:23-cv-00106-TWR-AHG, 2024 WL 3614672, at *8, 13 (S.D. Cal. July 30, 2024) (discussing protected conduct element of retaliation claim and citing cases holding verbal complaints about prison staff are protected conduct; "Plaintiff's allegation that he was not allowed to work and ultimately terminated from his plumber job in retaliation for making oral complaints about and filing a written grievance against Howard and Johnson suffices to meet the 'adverse action' element needed to state a First Amendment retaliation claim," citing *Vignolo*).

In sum, the Court finds Plaintiff's fourth amended complaint states plausible First Amendment retaliation claims against Defendants Lirones and Parks.

**III.  CONCLUSION AND ORDER**

For the foregoing reasons, this Court **ORDERS** as follows:

1. The Clerk of the Court will **ADD** M. Lirones as a defendant to the docket for this action; and

//

//

//

14

2. The Court will issue a separate order concerning service in due course.

IT IS SO ORDERED.

Dated: **December 18, 2024**

_____
UNITED STATES MAGISTRATE JUDGE